IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § § | |
| Plaintiff, § | |
| § | |
| v. § | Case No.: 4:24-cv-002805 |
| § | |
| THOMAS SAN MIGUEL, § § | |
| Defendant. § § | |

# COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against Defendant Thomas San Miguel ("Defendant" or "San Miguel") and alleges as follows:

## I. SUMMARY

1. Between November 2015 and December 2021, San Miguel raised approximately $21.3 million from over 300 investors nationwide through the fraudulent and unregistered offering of preferred stock in his fuel-blending company, SGR Energy, Inc. ("SGR Energy"). San Miguel, together with the sales personnel he hired and oversaw, lured both new and existing investors with claims of a 12% annual dividend funded by escalating revenue and profits and a $19 million account receivable on SGR Energy's balance sheet. San Miguel also told investors he would use their funds to grow SGR Energy's fuel-blending business by expanding the geographical scope of its customers and acquiring strategically situated blending facilities and fuel terminals. Claiming progress, San Miguel trumpeted SGR Energy's purported acquisition, in July 2018, of a large capacity fuel terminal in a northern port-town in Colombia. Finally, San Miguel claimed that no commissions would be paid to sales personnel on new investments.

1

2. All of these claims were false and misleading. As San Miguel knew, because he solely controlled the company's accounting, SGR Energy had generated only a fraction of the claimed revenues and likely never generated *any* profit. He likewise knew that the $19 million accounts receivable he recorded was false. San Miguel, who controlled every aspect of SGR Energy's operations, also knew that SGR Energy never acquired the Colombian terminal and that, instead, SGR Energy sustained enormous losses while leasing it. Finally, San Miguel likewise knew that SGR Energy was paying 8% sales commissions to the sales team for new investments.

3. By committing the acts alleged in this Complaint, San Miguel violated the antifraud and securities registration provisions of the federal securities laws, specifically Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

4. In the interest of protecting the public from any further fraudulent activity and harm, the Commission brings this action against San Miguel seeking: (a) permanent injunctive relief; (b) an officer-and-director bar; (c) civil penalties; and (d) all other equitable and ancillary relief to which the Court determines that the Commission is entitled.

## II.
## JURISDICTION AND VENUE

5. The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], seeking to permanently restrain and enjoin San Miguel from violating the antifraud and securities-registration provisions of the federal securities laws.

6. The Court has jurisdiction of this action under Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange

Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7. Venue is proper because the Houston Division of the Southern District of Texas is where a substantial part of the acts, omissions, transactions, practices, and/or courses of business giving rise to the claims occurred. In addition, venue is proper because San Miguel resides in Montgomery, Texas, which is served by this Division.

8. San Miguel, directly and indirectly, made use of the mails or of the means and instrumentalities of interstate commerce in connection with the acts, omissions, transactions, practices, and/or courses of business described in this complaint.

9. San Miguel engaged in the acts, omissions, transactions, practices, and/or courses of business described in this complaint in connection with the offer, purchase, and/or sale of securities.

## III.
## DEFENDANT AND RELEVANT ENTITY

**A.   Defendant**

10. San Miguel resides in Montgomery, Texas. San Miguel was SGR Energy's President, CEO, and sole director and is the owner of all of SGR Energy's common stock.

**B.   Relevant Entity**

11. SGR Energy is a private company headquartered in Houston, Texas. SGR Energy ceased operations in late 2021. Neither SGR Energy nor its securities offering discussed herein was ever registered with the Commission, and no exemptions from registration applied. On July 22, 2022, a creditor initiated involuntary Chapter 7 bankruptcy proceedings for SGR Energy. *In re SGR Energy, Inc.*, Case No. 4:22-bk-32050 (Bankr. S.D. Tex., Houston Division, filed July 22, 2022) (later converted to a voluntary Chapter 7 bankruptcy). The Court appointed a Chapter 7 Trustee, who is currently overseeing SGR Energy.

## IV.
## STATEMENT OF FACTS

**A.     Background**

12.     In SGR Energy's marketing materials and in webinars, San Miguel portrayed himself as a self-made, 30-year expert and entrepreneur in the field of cost-efficient fuel blending, with a customer base of electric power plants and merchant vessels.  He claimed that he acquired his expertise in the 1990s working for a private company for 18 years, initially as a fuel-tank truckdriver and later as a fuel blender.

13.     Equipped with his purported on-the-job expertise, San Miguel formed SGR Energy in 2011, and purportedly began blending unspecified additives into discounted, low-grade crude oil in a facility in Virginia for sale to end-users.  San Miguel claimed that by early 2013, after repaying several seed investors their contributed $1 million, he became sole owner of SGR Energy.  San Miguel conceived the idea of an ongoing stock offering to expand SGR's business and, ultimately, build an SGR Energy-owned oil refinery.

14.     San Miguel told employees that SGR Energy was blending fuel at a facility in Virginia using carefully guarded proprietary blending methods.  Notably, SGR Energy employees claim they have never seen any fuel-blending activity at the facility, and San Miguel spent little or no time in Virginia.  After acquiring unimproved land in Leggett, Texas in April 2017, San Miguel claimed he also blended fuel there—but no known SGR Energy employees ever witnessed it.

15.     San Miguel siloed SGR Energy employees and withheld information about the company's operations and finances.  SGR Energy's key employees had no clear understanding of what other employees did.  For example, SGR Energy's sales manager had no clear understanding of what the SGR Energy employees outside his sales force did, how SGR Energy generated end-use customers or revenue, or how San Miguel derived the revenue and earnings numbers that he

furnished every quarter for the sales team to relay to investors and prospective investors.

16. Even though San Miguel had no accounting experience or education, he handled all of SGR Energy's bookkeeping and accounting. He claimed to maintain SGR Energy's financial information in spiral notebooks—that he purportedly discarded—because he didn't know how to use common accounting software like Excel or QuickBooks. He never reconciled SGR Energy's bank statements. He didn't understand fundamental accounting principles such as cash and accrual accounting. He also didn't know the meaning of the common accounting acronym EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) in spite of using that metric in SGR Energy's promotional materials and investor updates, which he prepared. San Miguel also failed to pay SGR Energy's federal taxes for the last six years of its operation.

17. San Miguel was equally furtive in his handling of a purported asset held on SGR Energy's books—money purportedly owed to SGR Energy by an unidentified entity located in the Dominican Republic ("DR Entity"). San Miguel claimed he tracked the asset—purported cash held by the DR Entity in a bank account in Brazil—in a spiral notebook that he later, inexplicably, discarded.

**B.     The SGR Energy Offering**

18. San Miguel and the SGR Energy salespeople, whom San Miguel hired and oversaw, offered and sold SGR Energy "Series B" preferred stock to approximately 300 investors nationwide in a single offering spanning November 2015 through December 2021. The offering generated roughly $21.3 million in proceeds.

19. The salespeople cold-called potential investors identified in investor lists that the company purchased. They also fielded calls from potential investors routed to SGR Energy by advertisements, investment groups, and other sources. The salespeople's initial conversations with prospects were scripted. As instructed by San Miguel, the salespeople emphasized SGR Energy's

increasing revenue and earnings and underscored the annual 12% dividends that SGR Energy had unfailingly made to investors—as either cash payments or for reinvestment in SGR Energy preferred stock—since the offering's inception. The salespeople took no steps to ensure that investors were accredited, and merely instructed them to check the "accredited" questionnaire box, if applicable.

20. Prospects expressing interest in investing in SGR Energy were sent the latest version of the SGR Energy Private Placement Memorandum ("PPM") as well as various marketing materials—all of which San Miguel authored or approved. The marketing materials included various documents such as a brochure entitled "12% Annual Dividends Plus a 10X Multiple in Four Years (or Less) Is It Possible?" (the "Brochure"), Profit and Loss Statements ("P&L"), Balance Sheets, and a January 2021 "Business Plan." (The Business Plan, Brochure, P&L, and Balance Sheets, are collectively referred to as the "Marketing Materials.") Over the course of the SGR Energy stock offering, San Miguel updated the PPMs and Marketing Materials to reflect the ever-increasing sales price of the SGR Energy preferred stock, which San Miguel exclusively determined, purportedly based on his financial calculations.

21. Prospects and investors with detailed questions about SGR Energy were referred by salespeople to San Miguel, who then spoke to the investors alone in his office or on three-way calls with the sales manager.

22. San Miguel drafted and distributed quarterly investor updates ("Investor Updates") to the investors. In these Investor Updates, San Miguel highlighted the purported financial performance of SGR Energy as well as recent and planned business actions.

C.   **San Miguel's Misrepresentations to Investors**

23. San Miguel, directly and through his salespeople, made numerous misrepresentations to investors in connection with both their initial and supplemental investments.

He grossly inflated and fabricated SGR Energy's financial performance. He misrepresented significant business operations, including the alleged purchase of a Columbian shipping terminal. He also misrepresented that salespeople were not paid commissions in connection with SGR Energy's stock offerings.

1. ***San Miguel Lured New and Existing Investors With Representations about SGR's Financial Performance***

   a. <u>San Miguel's Misrepresentations Regarding SGR Energy's Revenue and Profits</u>

24. San Miguel misrepresented to investors that SGR Energy was staggeringly successful in terms of revenue, profits, and accounts receivable. Although the Marketing Materials and Investor Updates varied over time, they typically included representations regarding SGR Energy's alleged year-to-year revenue and EBITDA as compiled in the following table:

|  | REVENUE | EBITDA |
|---|---|---|
| 2017 | $91,044,891 | $6,431,232 |
| 2018 | $172,516,182 | $13,097,658 |
| 2019 | $265,653,300 | $18,619,404 |
| 2020 | $163,000,000 | $7,150,000 |
| 2021 | $387,400,000 | $29,200,000 |
| 2022 est. | $1,097,500,000 | $82,800,000 |
| 2023 est. | $2,082,900,000 | $157,000,000 |

25. The Business Plan provided these false economic performance values in chart format under the heading "PREVIOUS RESULTS" among other metrics such as SGR Energy's purported "REVENUE" and "EBITDA" for 2017 through 2020. In addition to the identical revenue and EBITDA metrics featured in the Business Plan for years 2017 through 2020, the Brochure also included performance metrics for 2021 along with skyrocketing revenue and EBITDA projections for 2022 and 2023. The P&L likewise contained the same 2017, 2018, and 2019 revenue and EBITDA performance metrics featured in the Business Plan and the Brochure.

26. San Miguel also represented in Investor Updates that SGR Energy was generating

profits. For example, in a January 9, 2017 Investor Update, San Miguel stated, "we achieved record revenue and profit numbers for year-end 2016." In a July 9, 2018 Investor Update, San Miguel represented that the company "generated a profit in five out of the six full years we have been in business" and that profits were "consistent." In an October 28, 2018 Investor Update, San Miguel reported that the company would "continue meeting our goal of giving back a fair share of the profits to our shareholders." In a March 24, 2021 Investor Update, San Miguel noted that the investors had been "enjoy[ing] profit dividends" from SGR Energy.

27. These performance metrics had no basis in reality. Based on SGR Energy's bank records and the testimony of former SGR Energy employees, it appears that the company generated *a total of approximately $11 million in revenue* from 2015 to the present and that **SGR Energy never generated any profit**.

    b. *San Miguel's Misrepresentations Regarding Accounts Receivable*

28. San Miguel also misled investors about a significant accounts receivable asset. The Balance Sheet purported to track an increasing accounts receivable of more than $19 million, purportedly from the DR Entity. In the Balance sheet, which San Miguel prepared, he represented that SGR Energy's "Accounts Receivable" were as follows:

| Year | Accounts Receivable |
| --- | --- |
| 2017 | $463,413 |
| 2018 | $6,280,677 |
| 2019 | $19,108,559 |

29. San Miguel purportedly tracked the DR Entity's accounts receivable balance in a spiral notebook that he inexplicably discarded. Curiously, no SGR Energy employees had any interactions with the DR Entity and don't recall even hearing the name. Therefore, all indications are that, like SGR Energy's fictitious revenue and profit numbers, the $19 million in accounts receivable is also a fabrication.

    c. *<u>The Financial Performance of SGR Energy Was Critical to Investors' Decisions to Invest</u>*

30. The revenue and earnings metrics were potent selling points for investors. San Miguel provided SGR Energy's sales manager with the numbers for each quarter. The sales manager, in turn, conveyed the data to his sales team to share with their prospects and investors. The sales manager was unaware of San Miguel's methodology for computing the numbers, relying on San Miguel's experience and control of the company for the numbers' bona fides.

31. San Miguel's misrepresentations regarding SGR Energy's financial performance not only brought in new investors, but also convinced existing investors to increase their investments. Some investors added to their holdings by purchasing more stock with additional funds. Investors also took advantage of the option to increase their SGR Energy stockholdings by reinvesting their dividends in SGR Energy stock in lieu of receiving cash payments. In fact, approximately 85% of quarterly dividends were reinvested in this manner.

32. San Miguel also set the purchase price of SGR Energy stock, consistently increasing it in purported proportion to SGR Energy's ever-increasing EBITDA, which San Miguel claimed he computed, again, without even understanding the meaning of the acronym. Armed with the inflated revenue and EBITDA figures, the salespeople contacted existing investors before a planned stock price increase to encourage them to buy more SGR Energy stock in the ongoing offering and to continue reinvesting their dividends.

33. San Miguel also coaxed investors to keep investing by making false and misleading statements in quarterly investor updates—each referencing SGR Energy's increasing revenue and earnings numbers. San Miguel drafted and authorized the dissemination of at least 17 such investor updates, in the form of letters, between January 9, 2017 and May 11, 2021.

### 2. *San Miguel Falsely Claimed That SGR Energy Acquired a Colombian Shipping Terminal*

34. San Miguel also misrepresented that SGR Energy had acquired a shipping terminal that would increase the company's financial performance. On July 10, 2018, San Miguel announced in an SGR Energy press release that SGR Energy had acquired a shipping terminal in the northern Colombian port town of Barranquilla. In the press release, San Miguel wrote:

> We are delighted to acquire from [sic] this premier marine transportation and terminal in Colombia (said SGR Energy CEO Tommy San Miguel). Swiss Terminal Barranquilla gives SGR Energy a strategic artery to pull supply from Colombia, increase our delivery volume to established customers, and will allow us to develop additional business.

35. The press release continued with San Miguel's account of the economic attractiveness of the terminal and its environs:

> Barranquilla Port is 166 square kilometers, or 64 square miles. The economy is diverse and strong in the logistics, energy and business services sectors. The port owes its ideal business location to running [sic] alongside the Magdalena River, as well as its quick access to the Ernesto Cortissoz International Airport and Colombia's national highway network.

36. On July 9, 2018, the day before the press release was issued, San Miguel told SGR Energy investors in a quarterly update letter that SGR Energy had acquired the terminal, named Swiss Terminal Barranquilla ("STB"). San Miguel unambiguously conveyed the acquisition's finality in a celebratory tone:

> I am so proud to announce to our shareholders that ***we have closed*** on our first terminal acquisition…. SGR made its first outside terminal acquisition on July 6th. The purchase of Swiss Terminal Barranquilla provides SGR with vital access to regional blend-stocks for our blending operations in Panama. [Emphasis added]

37. Approximately six months later, in a quarterly investor update letter dated January 18, 2019, San Miguel reflected on the events of 2018: "2018 has been quite a year for SGR. This

10

includes the *acquisition of our terminal in Barranquilla*….." [Emphasis added]

38. San Miguel's statements about SGR Energy's acquisition of STB were false. SGR Energy never acquired STB. Between May 4, 2018, and December 31, 2018, SGR Energy entered into three agreements with the owner of STB; all three agreements conditioned the closing of the acquisition on various contingencies, which were never satisfied. On May 4, 2018, two months before the July 10, 2018 press release discussed in paragraph 34 above, SGR Energy and STB's owner executed a term sheet setting the purchase price of STB at $13 million, and a conditional closing for November 15, 2018. On July 9, 2018, the day before SGR issued its press release, the parties deferred the conditional closing to December 31, 2018—a date that came and went without the closing. Despite this fact, SGR Energy issued, as mentioned, a quarterly update letter just 18 days later, on January 18, 2019, citing the "*acquisition of our terminal in Barranquilla*" as a 2018 SGR Energy accomplishment. On the very day the transaction was to close, December 31, 2018, the parties executed an amendment to the agreement, again retaining the $13 million stock purchase price, but re-setting the closing for June 30, 2019. The transaction did not close on June 30, 2019 or any time thereafter.

39. In fact, SGR Energy leased STB from July 2018 until the summer of 2021 when the owner evicted SGR Energy for failure to pay agreed monthly sums. In total, SGR Energy paid STB $1.74 million and an additional $1.1 million to the owner as advances on the $13 million purchase price. These amounts were ultimately losses because San Miguel made no attempt to recoup any of these sums, and none of it has been repaid to SGR Energy or its investors.

### 3. *San Miguel Falsely Claimed That SGR Energy Did Not Pay Commissions to Salespeople*

40. San Miguel represented in every version of the SGR Energy PPM that "[n]o commissions are being paid by SGR Energy to conduct the offering." Contrary to these

representations, SGR Energy did, in fact, pay commissions in connection with the SGR Energy stock offering. SGR Energy paid a gross 8% commission, consisting of a 6% commission to the sales-team member making the sale, and a 2% override to the sales manager.

41. Bank records indicate that SGR Energy paid at least $800,000 in commissions to the salespeople and other SGR Energy employees between November 2015 and December 2021.

42. San Miguel was well aware of these commission payments, as he was solely responsible for authorizing the commission payments, whether by check or wire transfer. He was also the sole recipient of SGR Energy's bank statements, which reflected the commission payments. Moreover, San Miguel even offered the sales personnel commissions at their hiring interviews.

**D.** **SGR Energy Bankruptcy**

43. SGR Energy ceased operations in late 2021. Shortly thereafter, SGR Energy was evicted from its office, and, on July 22, 2022, a creditor placed SGR Energy into Chapter 7 bankruptcy. SGR Energy is now under the control of the Chapter 7 Trustee.

**V.**
**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Violations of the Antifraud Provisions of the Exchange Act**
**Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]**

44. Plaintiff re-alleges and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth verbatim in this Claim.

45. By engaging in the acts and conduct alleged herein, San Miguel, directly or indirectly, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or severely recklessly:

      a. employed a device, scheme, or artifice to defraud; and/or

      b. made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

      c. engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

46. By reason of the foregoing, San Miguel violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Violations of the Antifraud Provisions of the Securities Act**
**Section 17(a) [15 U.S.C. §§ 77q(a)]**

47. Plaintiff re-alleges and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth verbatim in this Claim.

48. By engaging in the acts and conduct alleged herein, San Miguel, directly or indirectly, in the offer or sale of a security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, has:

      a. knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

      b. knowingly, severely recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      c. knowingly, severely recklessly, or negligently engaged in a transaction,

practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

49. By reason of the foregoing, San Miguel violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

**Unregistered Offers and Sales of Securities**
**Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)]**

50. Plaintiff re-alleges and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth verbatim in this Claim.

51. By engaging in the conduct described herein, San Miguel, directly or indirectly:

   a. made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement was in effect; and/or

   b. for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and/or

   c. made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement had been filed.

52. By reason of the foregoing, San Miguel violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

14

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

1. Permanently enjoining San Miguel from violating, directly or indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

2. Permanently enjoining San Miguel from participating, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, in any issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts;

3. Barring San Miguel from acting as an officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 or that is required to file reports pursuant to Exchange Act Section 15(d);

4. Ordering San Miguel to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

5. Granting such other and further relief as this Court may determine to be just, equitable, and necessary.

Dated:  July 29, 2024                              Respectfully submitted,

<div style="margin-left: 40%;">

*/s/ Jason P. Reinsch*
Jason P. Reinsch
Texas Bar No. 24040120
SDTX Bar No. 914573
United States Securities and Exchange Commission
Fort Worth Regional Office
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 900-2601 (phone)
(817) 978-2700 (facsimile)
ReinschJ@SEC.gov

ATTORNEY FOR PLAINTIFF SECURITIES
AND EXCHANGE COMMISSION

</div>